## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JORDAN SACKS, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC.,<br><br>                    Defendant. | Civil Action No. 1:21-cv-421<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................ 13

III.    PARTIES ............................................................................................................ 13

IV.     STATEMENT OF FACTS ................................................................................ 15

        A.      The Big Five Dominate the Market for the Publication of Trade
                Books. ...................................................................................................... 15

        B.      Amazon Dominates the Market for the Retail Sale of Trade Books. .................. 17

        C.      The Development of E-books Disrupted the Trade Book Industry. ..................... 18

        D.      As a Trade Book Publisher, Amazon Benefits from Inflated E-
                book Prices.............................................................................................. 21

        E.      Amazon Uses Anticompetitive Restraints to Immunize Itself from
                the Disadvantages of the Big Five's Inflated E-book Prices. ............... 22

        F.      Amazon is the Subject of Government Investigations for Possible
                Antitrust Violations................................................................................ 23

V.      EFFECTS ON INTERSTATE TRADE AND COMMERCE .......................................... 24

VI.     RELEVANT MARKET.................................................................................... 24

VII.    ANTITRUST IMPACT .................................................................................... 27

VIII.   ANTITRUST INJURY .................................................................................... 27

IX.     CLASS ACTION ALLEGATIONS ................................................................ 29

X.      CLAIMS FOR RELIEF ................................................................................... 31

        JURY DEMAND ................................................................................................. 34

Plaintiff Jordan Sacks ("Plaintiff"), by way of complaint against defendant Amazon.com, Inc. ("Amazon"), alleges as follows:

## I.      INTRODUCTION

1.      Amazon operates Amazon.com, the world's largest online retail platform. Sales on its website account for almost half of all retail e-commerce in the United States.[1] Amazon is also the largest retailer of electronic books ("e-books") in the United States, accounting for 76% of digital books sold in the U.S. in September of 2020.[2] The e-book market is projected to exceed six billion dollars in 2021. Amazon has used its market power in that market to preclude price competition. The result is that Plaintiff and members of the Class have paid and continue to pay supracompetitive prices for e-books.

2.      The domestic book publishing industry is dominated by Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers L.L.C. ("HarperCollins"), Macmillan Publishing Group, LLC ("Macmillan"), Simon & Schuster, Inc. and Simon & Schuster Digital Sales, Inc. (collectively "Simon & Schuster"); and Penguin Random House LLC ("Penguin") (collectively the "Big Five"). The Big Five have been Amazon's co-conspirators with respect to the violations described herein over the entire course of that conspiracy. The Big Five publish "trade books," among others, which encompass "general interest fiction and non-fiction books," as opposed to

---

[1] Amazon Now Has Nearly 50% of US Ecommerce Market, Emarketer (Jul. 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.

[2] Jeffrey A. Trachtenberg and Dana Mattioli, *Connecticut Investigating Amazon's E-Book Business*, Wall Street Journal (Jan. 13, 2021).

"'non-trade' books such as academic textbooks, reference materials, and other texts."[3] The Big Five's trade books account for about 80% of domestic trade book sales.[4]

3.    Plaintiff and the Class are consumers who purchased e-books published by the Big Five. The Big Five generally sell their e-books to consumers through online retail platforms, such as Amazon, Barnes & Noble, and Apple Books. Their dealings with those platforms are generally based on the "agency model," under which every transaction a direct one between the publisher and the retail consumer. The online platform serves only as the publisher's sales agent, and takes a commission on every book sold.[5]

4.    Plaintiff and Class members purchased one or more e-books directly from the Big Five through an online retail platform other than Amazon's. Plaintiff alleges that Amazon and the Big Five agreed to price restraints that cause Plaintiff and the Class to pay supracompetitive prices for e-books purchased from the Big Five through a retail platform other than Amazon.

5.    United States and European antitrust authorities have repeatedly investigated e-book prices in the last ten years, and the Connecticut Attorney General's office recently disclosed a new investigation into Amazon's e-book business in particular.[6]

6.    The European Commission ("EU Commission") first investigated potential collusion among the Big Five and Apple beginning in 2011.[7] The Department of Justice ("DOJ")

---

[3] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013).

[4] Constance Grady, *Milo Yiannopoulos's book deal with Simon & Schuster, explained*, Vox (Jan. 3, 2017), https://www.vox.com/culture/2017/1/3/14119080/milo-yiannopoulos-book-deal-simon-schuster-dangerous-boycott.

[5] CASE AT.40153, EBook MFNs and related matters (Amazon), https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4392_3.pdf,   ("5.4.2017 EU Commission Decision"), at 8.

[6] *See supra*, Trachtenberg and Mattioli.

[7] 5.4.2017 EU Commission Decision at 8.

and attorneys general from several states filed a civil action against the same entities in this District in early 2012.[8] Both the District Court and the EU Commission determined that the Big Five had colluded with Apple to raise retail e-book prices.[9] At that time, the agreement entailed switching from a standard wholesale model (wherein the retailer sets retail prices) to an agency model (wherein the publisher sets retail prices and the retailer acts strictly as its agent).[10] Pursuant to that conspiracy, the Big Five agreed to most favored nations ("MFN") clauses with Apple that required them to sell their e-books for the same prices via Apple's online store as they did via all other e-book retailers, including Amazon.[11]

7.     The District Court entered two consent decrees against the Big Five.[12] The Big Five also reached settlements with the EU Commission around the same time.[13] Both the consent decrees and the settlements required the Big Five to cease colluding with each other, to refrain from using MFNs in their agreements with e-book retailers for five years, and to permit e-book retailers to subtract their own discounts from the retail prices of the Big Five' e-books for two years.[14]

---

[8] *Id.*

[9] *Apple*, 952 F. Supp. 2d at 648; 5.4.2017 EU Commission Decision at 8.

[10] *Id.*

[11] *Id.*

[12] *See* Department of Justice, *U.S. v. Apple, Inc., et al.*, https://www.justice.gov/atr/case/us-v-apple-inc-et-al.

[13] 5.4.2017 EU Commission Decision at 8 n.11.

[14] 5.4.2017 EU Commission Decision at 8; *see, e.g.*, Final Judgment as to Defendants The Penguin Group, a Division of Pearson PLC, and Penguin Group (USA), *United States v. Apple*, Case No. 12-cv-02826-DLC (S.D.N.Y.), Docket No. 259 ("Final Judgment Penguin"), at 8 https://www.justice.gov/atr/case-document/final-judgment-defendants-penguin-group-division-pearson-plc-and-penguin-group-usa.

8.     The Big Five's e-book prices decreased substantially during that two-year period. But they immediately increased their prices in 2015 after renegotiating their agency agreements with Amazon, and have continued to maintain supracompetitive prices.

9.     Although Amazon claimed publicly that it was negotiating with the Big Five to ensure that it could continue to discount their e-books following the term of the consent decree, that did not transpire. The week after disclosing their respective agency contracts with Amazon, Penguin increased its e-book prices by 30%, HarperCollins increased its prices by 29%, Simon & Schuster increased its prices by 16%, Hachette increased its prices by 8%, and Macmillan increased its prices by 11%.

10.     The Big Five also raised prices specifically by increasing prices for new releases and reducing the number of price ranges into which they consolidated e-book prices. During the course of the Apple conspiracy, the Big Five priced 80% of their e-books within four price ranges. That figure doubled during the course of the DOJ consent decrees. After entering into their agreements with Amazon in 2015, the Big Five gradually reverted to using three or four price buckets by 2018, and through the present.

11.     Big Five e-book prices were most varied in 2014, during the course of the consent decree. After adjusting for inflation, e-book prices clustered around $12 and only about 5% of titles sold in the $15 range. In 2020, 55% of titles sold for about $15 and less than 5% sold around $12.

12.     Had Amazon and its Big Five co-conspirators only raised prices on Amazon, consumers would be free to shop for competitively-priced e-books on other online platforms. But they agreed to price restraints that prevent that from happening.

13.     The EU Commission commenced another investigation in 2015,[15] and determined that Amazon used MFNs in its agreements with the Big Five, despite their ostensibly being precluded from agreeing to MFNs by their earlier settlements with the EU Commission.[16] The EU Commission found that the MFNs and analogous provisions in the Big Five's contracts with Amazon had probable anticompetitive effects.[17] Amazon and the EU Commission reached a settlement in 2017 that prohibited Amazon from enforcing its MFNs and similar provisions for five years.[18] But that settlement had no effect on Amazon's agreements with the Big Five in the United States.

14.     The House Judiciary Committee investigated Amazon starting in 2019 pursuant to a broader investigation of competition in digital markets.[19] After a 16-month investigation, the Committee issued a report and recommendations. The Committee determined, among other things, that Amazon's use of MFN provisions in its agreements with book publishers harms competition in the retail book market, including the e-book market.[20] The House Report concluded that "Amazon's dominance in e-books and its anticompetitive application of price parity clauses to its business relationships in this market eliminates the ability of rivals or new entrants to gain any meaningful competitive advantage relative to Amazon."[21]

---

[15] European Commission Initiates Formal Proceedings Against Amazon, https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_1359_6.pdf.

[16] 5.4.2017 EU Commission Decision at 4-5.

[17] *Id.* at 20-38, 43.

[18] *Id*. at 39, 41-42.

[19] House Judiciary Committee, Investigation of Competition in Digital Markets, Oct. 5, 2020, at 6, https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf ("House Report").

[20] *Id.* at 295.

[21] *Id.* at 296.

15.     The pending Connecticut investigation is similarly focused on Amazon's agreements with publishers, and each of the Big Five publishers received a subpoena in 2019 pursuant to that investigation.[22]

16.     Consumers do not sufficiently benefit from the cost reductions resulting from the low printing and distribution expenses associated with e-books as compared to print books. Amazon charges high commissions and other costs to publishers, including the Big Five, which significantly increases retail prices for e-books sold by Amazon.[23] Amazon increases the cost of selling e-books by tying its distribution services (e.g., helping consumers find and purchase e-books on the Amazon platform, processing payments, delivering e-books) to its advertising services, which are designed to optimize the placement of advertisements to consumers on its online platform.[24] Amazon further raises the Big Five's selling costs by manipulating e-book "discovery tools to make a publisher's books difficult to find without the purchase of advertising or refuses distribution unless the publisher also purchases advertising."[25]

17.     Moreover, via its MFNs, Amazon has required, and publishers have agreed to grant Amazon, prices, terms, and conditions equal to or better than those offered to Amazon's competitors, and to notify Amazon about such terms, thereby restricting discounts to consumers, and stifling innovation in the trade e-book market.[26]

---

[22]*See* Trachtenberg and Mattioli, *supra* n.2.

[23] Letter from Maria A. Pallante, Pres. & CEO, Ass'n of Am. Publishers, Mary E. Rasenberger, Exec. Dir., Authors Guild, Allison K. Hill, CEO, Am. Booksellers Ass'n, to Hon. David. N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Aug. 17, 2020), https://publishers.org/wp-content/uploads/2020/08/Joint-Letter-to-Rep-Cicilline-081720.pdf.

[24] *Id.* at 2.

[25] *Id.* at 3.

[26] *Id*. at 7.

18.     In a competitive market, the Big Five could sell e-books at lower prices on their own websites or through Amazon's competitors that offer lower commissions and fees. But they have agreed with Amazon not to do that. This prevents Amazon's competitors from expanding their market shares and reduces the incentive for new competitors to enter the market.[27] Amazon and the Big Five entered into these anticompetitive agreements with the purpose and effect of injuring consumers by eliminating price competition that Amazon would otherwise face, and raising e-book prices sold through Amazon's retail rivals above competitive levels.

19.     Because Amazon and its co-conspirators have not made the exact terms of their agreements public, Plaintiff relies on public disclosures and investigations. These reports describe in a broader sense the contractual arrangements that Amazon uses in its agreements with publishers to prevent competition from other online e-book retailers.

20.     MFNs typically entitle a buyer to prices and/or terms equal to or better than those a seller offers to any other buyer. But Amazon's contracts with the Big Five are an adaptation of MFNs to the agency model. The Big Five rely on the agency model to sell e-books, which means that Amazon is not a buyer and the Big Five are not its suppliers.

21.     Though Amazon has avoided using the term "most favored nation," the Judiciary Committee found that Amazon has continuously imposed on book publishers contract provisions that effectively function as MFNs, even under the current agency model.[28] Amazon uses these provisions to prevent "publishers from partnering with any of Amazon's competitors" and to reinforce "Amazon's 'stranglehold' and 'control' over book distribution."[29] Because of

---

[27] House Report at 295.

[28] *Id.*

[29] *Id.*

Amazon's market power in the retail e-book market, these contractual requirements prevent Amazon's actual and potential retail competitors from introducing alternative business models, offering promotional advantages, or offering customers lower prices on their own.[30] The House Judiciary Committee's findings are consistent with the earlier conclusions of the EU Commission.[31]

22.     The EU Commission findings regarding Amazon's MFN practices divided them into five categories.

23.     *First,* the EU Commission determined that Amazon uses "business model parity clauses" in its contracts with e-book publishers.[32] These clauses require the Big Five co-conspirators to notify Amazon of the distribution of their e-books through alternative business models, and offer Amazon the same material terms and conditions, even if the competing retailer itself operates under a different business model.[33] Alternative business models include subscriptions, streaming, rentals, book clubs, bundling of e-books with print books, and reduced prices for partial downloads.[34] This clause creates a debilitating disincentive for the Big Five to support and invest in innovative business models that might result in greater competition.[35] It likewise disincentivizes Amazon's e-book retail competitors' from developing such models.[36] It also deters the entry of new e-book retail competitors or the expansion of Amazon's existing

---

[30] *Id.* at 295-96.

[31] 5.4.2017 EU Commission Decision.

[32] *Id.* at 9, 12, 22-26.

[33] *Id.* at 9, 22.

[34] *Id.* at 9

[35] *Id.* at 22.

[36] *Id.* at 9.

competitors, which reduces competition in the e-book retail market, and strengthens Amazon's dominant position in that market.[37]

24.     *Second*, Amazon imposed, and its co-conspirators agreed to, "selection parity clauses."[38] These clauses require the Big Five to offer Amazon parity with all of its competitors with respect to: (1) any e-book available within a particular geographical territory; (2) any particular date and time for an e-book's release; and (3) any feature, functionality, usage rule, element or content for one or more e-books.[39]

25.     The EU Commission found such clauses in Amazon's contracts with the Big Five posed serious threats to competition in numerous ways.[40] They reduced the incentives of Amazon's competitors to develop and innovate features and functionalities of e-books.[41] They also thwarted development and innovation in e-books and e-book readers.[42] Amazon's selection parity clause harms consumers by eliminating publishers' incentive to develop new e-book functionalities.[43] It harms retail competition because it forecloses a significant avenue for retailers to compete with Amazon by supporting such functionalities.[44]

26.     *Third*, Amazon required, and the Big Five maintained "retail price parity" provisions in their agency contracts with Amazon.[45] These retail price parity clauses included:

---

[37] *Id.*

[38] *Id.* at 27-31.

[39] *Id.* at 27.

[40] *Id.* at 27-31.

[41] *Id.* at 27.

[42] *Id.* at 28-29.

[43] *Id.*

[44] Id. at 31.

[45] *Id.* at 32.

(1) the agency price parity clause; (2) the discount pool provision and (3) the promotion parity clause.[46]

27.     The agency price parity clause contractually obligated the Big Five to set retail prices on Amazon that are no higher than the retail prices charged by Amazon's competitors.[47]

28.     The promotion parity clause precludes the possibility that the Big Five might even temporarily set lower retail prices on the platform of any Amazon e-book competitor, absent offering an equivalent promotion to Amazon.[48]

29.     Similarly, the discount pool provision gives Amazon the ability to set discounted prices which are equal to or less than the cheapest retail price of any e-book distributed by a publisher to Amazon's competitors.[49]

30.     The EU Commission determined that Amazon's retail price parity provisions in the contracts with its Big Five co-conspirators limited the ability of Amazon's competitors "to attract buyers by offering lower retail prices than those on Amazon. This may discourage competing E-book Retailers from entering in the first place."[50] The Commission determined that these arrangements were likely to reduce competition between e-book retailers by reducing the incentive of Amazon competitors to compete by offering lower rates of agency commissions.[51] Further, such arrangements actually incentivize Amazon to charge higher commission rates, as e-

---

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id*.

[50] *Id*. at 33.

[51] *Id*. at 34.

book suppliers had no ability to steer customers away from Amazon to its competitors based on their commission or retail price.[52]

31.     These retail price parity provisions effectively functioned like MFNs in that they enabled Amazon to prevent its competitors from undercutting the Big Five's e-book prices on Amazon.[53] Once notified of the availability of its co-conspirators' e-books at lower prices, Amazon typically "requested" that they charge the same prices on Amazon.[54] If publishers did not comply, Amazon retaliated or threatened to retaliate by disabling purchases for one or several of the publisher's e-books on its platform, by excluding the publisher's e-books from all promotional activity, by removing the pre-order buttons for the publisher's e-books, or by prominently displaying banners for other publishers' e-books.[55] Eventually, the Big Five complied with all of Amazon's requests, and ceased entering into promotions proposed by Amazon's retail competitors.[56] These notification provisions are anticompetitive because they eliminated any incentive for the Big Five to offer lower prices or better terms to any of Amazon's existing or potential competitors.[57]

32.     Upon the conclusion of the European Commission's investigation, Amazon agreed not to enforce its MFNs and similar provisions in Europe for the next five years. That entailed: no longer requiring publishers to provide Amazon with equal or better terms than they provided to its competitors; and no longer requiring publishers to notify Amazon about its

---

[52] *Id.*

[53] *Id.* at 36.

[54] *Id.*

[55] *Id.* at n.55.

[56] *Id.* at 37.

[57] *Id.*

competitors' alternative or new business models, release dates, selections of e-books, features of their e-books, promotions, agency prices, agency commissions or wholesale prices.[58] One Commissioner remarked that the agreement would "open the way for publishers and [booksellers] to develop innovative services for e-books, increasing choice and competition to the benefit of European consumers."[59]

33.    Amazon's and the Big Five's continued use of MFNs in the United States remains anticompetitive, and contrary to the European Commission's well-founded conclusions. Despite multiple investigations and censures, Amazon and the Big Five continue to engage in a conspiracy to fix the retail prices of e-books in violation of Section 1 of the Sherman Act.

34.    Amazon's agreements with its co-conspirators constitute an unreasonable restraint of trade that prevents competitive pricing, limits innovation, and imposes overcharges on Plaintiff and other consumers when they purchase the Big Five's e-books from Amazon's competitors. Plaintiff therefore seeks, in addition to compensatory damages, injunctive relief under the Clayton Act to prevent Amazon and the Big Five from enforcing these restraints.

35.    Amazon maintains monopoly power in the domestic retail trade e-book market. Amazon has willfully acquired that monopoly power through anticompetitive conduct, fixing the retail prices of trade e-books at supracompetitive levels on both its own platform and those of its competitors. Its conduct is an abuse of monopoly power in violation of Section 2 of the Sherman Act.

---

[58] *Id.*

[59] *Id.*

## II.     JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 & 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26. This

Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy for the

Class exceeds $5,000,000 and members of the Class are citizens of different states than

Defendants.

37.     Venue is proper in this District pursuant to Sections 4, 12, & 16 of the Clayton

Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c), and (d). Amazon resided, transacted

business, were found, or had agents in this District, and a substantial portion of the affected

interstate trade and commerce described in this Complaint was carried out in this District.

## III.     PARTIES

38.     Jordan Sacks is a resident of Arlington, Virginia. Mr. Sacks purchased a book

published by co-conspirator Simon & Schuster, Inc. from Apple Books during the proposed class

period.

39.     Amazon.com, Inc. is a Delaware corporation with its principal place of business

in Seattle, Washington. Amazon is active in online retail, e-commerce services, digital content,

and web and infrastructure computing services. Its primary source of revenue is the sale of a

wide range of products and services to consumers. The products Amazon offers include

merchandise and content purchased for resale from vendors, and those offered by third-party

sellers. Amazon also manufactures and sells electronic devices, including Kindle e-book readers,

Fire tablets, Fire TVs, Echo, and Fire phones. It also sells services such as cloud computing

services, fulfillment services (i.e., storing, packing, shipping, and providing customer support for

products sold by others), publishing (including self-publishing services), digital content subscriptions, and advertising.

40.     Amazon sells e-books and offers e-book reading subscription services to its retail customers throughout the United States from the Amazon platforms. Amazon also operates Amazon Publishing, a division that publishes books and ostensibly competes with the co-conspirator publishers.

### Co-Conspirators

41.     Co-conspirator Hachette Book Group, Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of Lagardère Group, a French conglomerate. Its imprints include, among others: Center Street; FaithWords; Grand Central Publishing (formerly Warner Books); Little, Brown and Company; Orbit; Perseus Books; and Worthy.

42.     Co-conspirator HarperCollins Publishers L.L.C. is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of News Corporation. Its imprints include, among others: Avon; Caedmon; Ecco; Harlequin Books; Walden Pond Press; and William Morrow.

43.     Co-conspirator Macmillan Publishing Group, LLC is a New York corporation with its principal place of business in New York, New York. It is a subsidiary of Holtzbrinck Publishing Group, a German conglomerate. Macmillan operates eight divisions in the United States: Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company; Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press and Tor/Forge.

44.     Co-conspirator Penguin Random House LLC is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of Bertelsmann SE, a

14

German conglomerate. Its imprints include: Alfred A. Knopf; DK; Doubleday; Penguin; Putnam; Random House; Viking Books; and Vintage Books.

45.     Co-conspirator Simon & Schuster, Inc. is a New York corporation with its principal place of business in New York, New York. It is a subsidiary of ViacomCBS Inc. Its imprints include: Beyond Words Publishing; Folger Editions; Gallery Books; MTV Books; Pocket Books; and Scribner. On November 25, 2020, ViacomCBS Inc. announced plans to sell Simon & Schuster to Bertelsmann SE, Penguin's parent company. The proposed transaction "would create a publishing behemoth accounting for about a third of all books sold in the U.S."[60]

## IV.     STATEMENT OF FACTS

### A.     The Big Five Dominate the Market for the Publication of Trade Books.

46.     The Big Five generally publish the most popular authors and books in both fiction and non-fiction, including the vast majority of the New York Times bestsellers.[61] Their dominance is in large part attributable to a long history of mergers and acquisitions that has resulted in their acquiring vast numbers of subsidiaries and divisions, more commonly known in the industry as "imprints." The last decade in particular has seen a wave of major acquisitions.[62]

47.     HarperCollins was established in 1817 as J. and J. Harper, and eventually became Harper & Row.[63] Hachette's American division began as Little, Brown and Company,

---

[60] Benjamin Mullin and Jeffrey A. Trachtenberg, *Penguin Random House Parent to Buy Simon & Schuster From ViacomCBS*, Wall Street Journal (Nov. 25, 2020).

[61] *United States v. Apple, Inc*., 791 F.3d 290, 298 (2d Cir. 2015).

[62] Alexandra Alter and Edmund Lee, *Penguin Random House to Buy Simon & Schuster*, New York Times (Nov. 25, 2020).

[63] Peter Lee, *Reconceptualizing the Role of Intellectual Property Rights in Shaping Industry Structure*, 72 Vand. L. Rev. 1197, 1259 (2019).

established in 1837.[64] In the 1920s, Penguin, a leading British publisher, acquired several

formerly independent publishers, including Viking and Putnam.[65] Simon & Schuster was

established in 1924, and it has been variously owned by Marshall Field, Gulf + Western,

Viacom, and CBS Corporation. By 1950, publishing was substantially "concentrated in a

relatively few houses."[66]

48.     Consolidation accelerated in the 1980s. Between November 1985 and November

1986 alone, there were 57 major publishing acquisitions.[67] News Corp. acquired Harper & Row

in 1987, which formed HarperCollins after it acquired William Collins & Sons in 1990.[68]

Hachette expanded rapidly beyond its French roots into English-language books in the 2000s.[69]

By 2006, the six largest U.S. trade book publishers accounted for 90 percent of total sales.[70] In

2013, Penguin merged with Random House, and now controls approximately 25 percent of the

English-language publishing market.[71]

49.     Smaller trade publishers are increasingly unable to compete with the Big Five.

Houghton Mifflin Harcourt recently announced that it was exploring a sale of its trade publishing

division, possibly to Macmillan or Hachette.[72]

---

[64] *Id.*

[65] *Id.* at 1259-60.

[66] *Id.* at 1260.

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id*. at 1262.

[72] *See supra*, Alter & Lee.

**B.    Amazon Dominates the Market for the Retail Sale of Trade Books.**

50.    Amazon sells more books than any other retail outlet in history.[73] Prior to Amazon's emergence, there were approximately 4,000 independent bookstores in the United States.[74] That number has since been halved, and Amazon's market power has grown accordingly.[75] Borders Group, Inc., which operated nearly 700 brick-and-mortar outlets at its peak, ceased operations in 2011.[76] Barnes & Noble, currently the second largest retail bookseller, has long been in decline, closing 150 brick-and-mortar outlets over the past decade.[77] Amazon now controls 76% of the e-book market.[78]

51.    Unlike brick-and-mortar stores, Amazon relies on massive data to assess its customers' existing interests. According to the market research firm Codex Group, readers browsing in a physical bookstore consider new books at about three times the rate they do while shopping on Amazon.[79] Even though it dominates the book market, Amazon accounts for only

---

[73] Porter Anderson, *US Publishers, Authors, Booksellers Call Out Amazon's 'Concentrated Power' in the Market*, Publishing Perspectives (Aug.17, 2020), https://publishingperspectives .com/2020/08/us-publishers-authors-booksellers-call-out-amazons-concentrated-power-in-thebook-market/.

[74] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014), https://www.newyorker.com/ magazine/2014/02/17/cheap-words.

[75] Amy Watson, Number of Independent Bookstores in the U.S. 2009-2019, Statista (Oct. 29, 2019), https://www.statista.com/statistics/282808/number-of-independent-bookstores-in-the-us/.

[76] Associated Press, *Borders Seeks to Liquidate All Stores*, Toledo Blade (July 18, 2011).

[77] Larry Light, The Barnes & Noble Buyout: A Godsend for Book Readers and Investors, Forbes (Jun. 24, 2019), https://www.forbes.com/sites/lawrencelight/2019/06/24/the-barnes-noble-buyout-a-godsend-for-book-readers-and-investors/?sh=70936407ef8f.

[78] *See supra* note 2, Trachtenberg and Mattioli.

[79] Stacy Mitchell and Olivia LaVecchia, *Report: Amazon's Monopoly*, ILRS (Nov 29. 2016), https://ilsr.org/amazons-monopoly/ at 27.

seven percent of new book discovery. The corresponding figure for independent bookstores is 20%.[80]

### C.    The Development of E-books Disrupted the Trade Book Industry.

52.    In 2007, Amazon's Kindle became the first e-reader to gain widespread commercial acceptance, and Amazon became the market leader in the sale of e-books and e-book readers, selling nearly 90% by 2009.[81] Amazon gained market share by discounting new releases and bestsellers, and other e-book retailers frequently matched its prices.[82] At that point, the Big Five distributed both print books and e-books through a standard wholesale pricing model, under which they only suggested retail prices. They typically discounted their wholesale prices for e-books by 20% from those for equivalent print books, due to the reduced costs associated with e-books.[83] With those discounts, Amazon's standard $9.99 retail price roughly matched the wholesale price of many of its e-books.[84]

53.    The Big Five feared that Amazon's $9.99 price point would undermine their profits, by both reducing unit sales of profitable hard-cover books, and conditioning customers to expect lower prices for hard-cover books.[85] They also feared Amazon's unprecedented power in the industry, and that Amazon might bypass them entirely by dealing directly with authors and literary agents.[86]

---

[80] *Id.*

[81] *Apple*, 952 F. Supp. 2d at 649.

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

54.      In 2009, each of the Big Five separately objected directly to Amazon about its retail pricing, all to no avail.[87] Undeterred, they collectively turned to Apple to address the issue. Apple complied because it recognized that selling e-books was potentially even more lucrative than selling digital music, a market that Apple already dominated.[88] Apple believed that its iPad, which was in its final planning stages, would revolutionize the e-reader market by virtue of technological features vastly superior to those of any existing e-reader.[89]

55.      Over the course of a few weeks during late 2009 and early 2010, Apple and the Big Five agreed that the Big Five would have to adopt the agency model in order to raise retail prices. That model would enable the publishers to set retail prices and sell the books, while Apple would receive a 30% commission for facilitating the sales.[90] When certain Big Five publishers hesitated to go forward with the plan, Apple put an MFN clause in the proposed written agreements that would ensure that the Big Five priced their e-books on Apple at or below the lowest retail price otherwise available in the marketplace. Apple thus enabled the Big Five to set the retail prices of their books, while at the same time guaranteeing that it would never have to compete on price.[91]

56.      The Big Five then forced Amazon to accept the agency model by threatening to withhold their e-books by seven months after releasing the corresponding print books.[92] After

---

[87] *Id.* at 650.

[88] *Id.* at 654-55.

[89] *Id.* at 655.

[90] *Id.* at 658-62.

[91] *Id.*

[92] *Id.* at 679-80.

unsuccessfully attempting to retaliate, Amazon complied, but filed a complaint with the FTC.[93] Amazon entered into agency agreements with each of the Big Five publishers by mid-2010. Each agreement included a "model parity" clause that gave Amazon the option to re-adopt the wholesale model if the publisher agreed to such a model with any other e-book retailer.[94] The Big Five subsequently required Google and Barnes & Noble to enter into agency model agreements for e-books.

57.     E-book prices immediately increased across the market.[95]Apple and the Big Five profited in the short term. Apple gained 22% of the retail e-books market in the first two months of operating its sales platform.[96] The Big Five lost revenue as to e-books under the new model, but offset those losses by raising the prices of their print books.[97]

58.     However, in late 2011, consumers filed a price-fixing class action in this District, and the EU Commission opened its own investigation. In 2012, the DOJ and several attorneys general filed enforcement actions. Rather than proceeding to trial in the federal actions, the Big Five entered into consent decrees with the DOJ, which required them to terminate their agreements with Apple and other e-book retailers that restricted the retailers' ability to discount e-books.[98] Apple proceeded to trial in this District. The court found that Apple and the Big Five had carried out a per se illegal horizontal price-fixing agreement, with the purpose and effect of

[93] *Id*. at 680-81.

[94] *Id*. at 681.

[95] *Id*. at 683.

[96] Marco Tabini, *Apple grabs 22 percent of e-book market with iBooks* Macworld (Jun. 7, 2010), https://www.macworld.com/article/1151813/ibooks.html.

[97] *Apple Inc*., 952 F. Supp. 2d at 683.

[98] *See*, e.g., Final Judgment Penguin, at 8-9.

eliminating price competition in the e-book market.[99] The court entered a $450 million judgment against Apple.

59.     The consent decrees required that, for a period of two years, the Big Five would permit retailers to discount e-book prices and to offer promotions to encourage consumers to purchase e-books. For a period of five years, they would not enter into agreements with e-book retailers that contained MFN clauses governing prices.[100] They agreed to similar provisions to resolve the European proceeding.

60.     As a result, competitive pricing prevailed between 2013 and 2015. But prices rose as soon as the publishers renewed their agency agreements with Amazon.

**D.     As a Trade Book Publisher, Amazon Benefits from Inflated E-book Prices.**

61.     In part due to the friction between itself and the Big Five, Amazon established Amazon Publishing, which it now touts as "a leading publisher of commercial and literary fiction, nonfiction, and children's books."[101]

62.     Amazon claims that at least 36 of its authors have sold at least a million books.[102] Best-selling author Dean Koontz has a five-book deal with Amazon Publishing.[103] One of

---

[99] *Apple Inc.*, 952 F. Supp. 2d at 694.

[100] Final Judgment Penguin, at 11, 18.

[101] Amazon Publishing, https://amazonpublishing.amazon/about-us.html.

[102] *Id.*

[103] Porter Anderson, *Dean Koontz's Jump to Amazon Publishing: Will Other Authors Follow?*, Publishing Perspectives (July 22, 2019), https://publishingperspectives.com/2019/07/bestseller-dean-koontz-jumps-to-amazon-publishing-five-book-deal-plus-stories/.

Amazon's imprints, Amazon Crossing, is the largest publisher of translated fiction in the United States.[104] Amazon currently operates 16 imprints and has nine offices around the world.[105]

63.     Amazon thus benefits from the Big Five's high prices, which enable Amazon to charge higher prices for its own e-books.

>    **E.     Amazon Uses Anticompetitive Restraints to Immunize Itself from the Disadvantages of the Big Five's Inflated E-book Prices.**

64.     By virtue of its dominance of the retail market for e-books, Amazon's maintains substantial bargaining power with the Big Five. It could have maintained its ability to discount their e-books, but instead agreed to let them set supracompetitive retail prices in exchange for high commissions and a guarantee that Amazon could not be undersold by its competitors.

65.     According to the House Judiciary Committee, Amazon has at all times used MFNs or their equivalents in its agreements with trade publishers.[106] The EU Commission determined that even when the Big Five were nominally prohibited from having MFNs in their contracts, they evaded that restriction in dealing with Amazon by using notification provisions that had the same effect.[107]

66.     No matter the means, Amazon's objective has always been to prevent "publishers from partnering with any of Amazon's competitors" and to reinforce "Amazon's 'stranglehold' and 'control' over book distribution."[108] Amazon has acquired and maintained its monopoly

---

[104] Ed Nawotka, *Translations Pay off For Amazon*, (Nov. 8, 2019) Publisher's Weekly, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/81707-translations-pay-off-for-amazon.html.

[105] Amazon Publishing.

[106] House Report at 295-96.

[107] 5.4.2017 EU Commission Decision at 11.

[108] House Report at 295-96.

power in large part through these restraints.[109] Its competitors lack any incentive to offer

promotional advantages or alternative business models to gain market share because Amazon

requires that the Big Five grant it whatever opportunities they offer to Amazon's competitors.[110]

The result is reduced innovation and supracompetitive retail prices.[111]

F.   **Amazon is the Subject of Government Investigations for Possible Antitrust Violations.**

67.    The EU Commission investigated Amazon's contracts with e-book publishers

between 2015 and 2017. The Commission cited numerous issues relating to Amazon's MFNs

and notification clauses, finding that Amazon used these clauses to restrain its competitors'

market shares and discourage potential competitors from entering the market.

68.     The House Judiciary Committee began an investigation in 2019 that entailed

seven hearings on digital markets, addressed to issues including data privacy, innovation, free

speech, and competition. Pursuant to that investigation, the Committee requested documents and

information regarding Amazon's market share and competitors in numerous markets.[112]

69.    The Committee issued a report in October 2020. It concluded that Amazon

"serves as a gatekeeper over a key channel of distribution," the domestic online retail market,[113]

and that by controlling access to that market, it abuses its tremendous power "by charging

exorbitant fees, imposing oppressive contract terms, and extracting valuable data from the people

---

[109] *Id.*

[110] 5.4.2017 EU Commission Decision at 20-38, 43.

[111] *Id.*

[112] Letter from U.S. House of Representatives Committee on the Judiciary to Jeff Bezos, Amazon CEO (Sept. 13, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/amazon%20rfi%20-%20signed.pdf.

[113] House Report at 6, 15.

and businesses that rely on" it.[114] It also "uses its gatekeeper position to maintain its market power and "to further entrench and expand" its dominance.[115] The Committee compared Amazon's conduct to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[116]

70.     Amazon also faces an investigation by the Federal Trade Commission and antitrust scrutiny by state attorneys general offices in California, Washington, and New York,[117] in addition to the recently-disclosed Connecticut investigation addressed strictly to e-books.

## V.     EFFECTS ON INTERSTATE TRADE AND COMMERCE

71.     Amazon's and its co-conspirators' business activities that are the subject of this Complaint were within the flow of and substantially affect ted interstate trade and commerce.

72.     During the Class Period, Amazon's and its co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## VI.     RELEVANT MARKET

73.     The antitrust injuries alleged herein, including harm to consumers, have occurred in the United States retail market for trade e-books. Amazon and its co-conspirators' agreed-upon price restraints unreasonably restrain these markets. Plaintiff seeks relief individually and on behalf of other retail purchasers, who purchase trade e-books from one or more of the Big Five co-conspirators through electronic platforms other than Amazon's platform.

---

[114] House Report at 6.

[115] *Id.*

[116] *Id.*

[117] House Report at 253; Press Release, Fed. Trade Comm'n, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news- events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

74.     Amazon's restraints on competition directly impact the U.S. retail market for trade e-books, as alleged herein.

75.     Trade books comprise a product market distinct from non-trade books, such as reference and academic books.[118] They also comprise a product market distinct from self-published books. Self-published authors incur all costs and are solely responsible for content and marketing, whereas trade publishers receive the rights to sell authors' books in exchange for editing, publishing, marketing, and distributing those books.[119] Trade publishers are highly selective. They do not read 95% of the manuscripts they receive and publish only about 1% of the manuscripts they do review.[120] The selection, editing, and promotional process is expensive, and trade books reflect publishers' investment in that process.

76.     Within the market for trade books, there is also a distinct product market for the retail sale of trade e-books that is separate from the retail sale of trade print books and trade audio books.[121]

77.     Products' functional interchangeability typically depends on their physical characteristics.[122] E-books are digital products. Their physical characteristics differ from those of print books. They are also different from audio books, which may be physical or digital, but are

---

[118] *Apple*, 952 F. Supp. 2d at 648 n.4.

[119] Leigh Shine, *Calculating the Odds of Getting A Traditional Publisher*, Medium (Dec. 22, 2016), https://medium.com/publishizer/calculating-the-odds-of-getting-a-traditional-publisher-798b1c7b94b0.

[120] Odds Of Being Published - Fiction Writer's Mentor, http://www.fiction-writers-mentor.com/odds-of-being-published.

[121] *Apple Inc.*, 952 F. Supp. 2d at 694 n.60 (defining the relevant market as trade e-books in the United States); 5.4.2017 EU Commission Decision at 14.

[122] 2 Federal Antitrust Law § 10.2 (2020).

made for listening rather than reading. These distinctive characteristics place print books and audiobooks outside of the markets for e-books.[123]

78.     The EU Commission determined that consumers would be unlikely to switch from e-books to print books in the event of a 5-10% increase in the retail price of e-books, because e-books would still generally be priced significantly lower than print books.[124] Consumer preferences also play an important role in distinguishing the two formats. The EU Commission's investigation of the e-books market showed that consumers will purchase e-books rather than print books for reasons including the following: (i) e-books are easier to carry than print books, particularly when travelling, (ii) e-books have functionalities unavailable in print books, such as varying the type and size of fonts; (iii) e-books can support interactive features such as video or music add-ons, dictionaries, and links to additional information regarding the text or the author, and (iv) e-books can be purchased, downloaded and read immediately at any time.[125] The EU Commission also noted that a significant number of titles are only, or more readily, available in the e-book format.[126]

79.     To find significant supply-side substitutability, print book retailers and e-book retailers would have to be able to enter each other's markets quickly and easily. The EU Commission found that was not possible. The distribution of print books entails substantial investments in warehousing and logistics, whereas e-book distribution requires establishment and maintenance of an online distribution platform.[127] A standard print bookstore cannot switch

---

[123] 5.4.2017 EU Commission Decision at 14.

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Id.*

from selling print books to e-books without acquiring significant tangible and intangible assets, incurring additional investments and making significant strategic decisions. The same holds true for an e-book retailer switching to print sales.[128]

80.    The EU Commission found that audio books are distinct from both print books and e-books, notably in terms of (i) pricing at the wholesale and retail levels and (ii) their typical end consumer and mode of consumption.[129]

81.    The relevant geographic market is the United States.

## VII.    ANTITRUST IMPACT

82.    Amazon's and its co-conspirators' conduct described herein has substantially impaired competition in the retail e-book market.

83.    Amazon's and its co-conspirators' conduct described herein lacks any procompetitive justification. Moreover, the harm to competition and the resulting antitrust injury suffered by Plaintiff and Class members more than offsets any purported procompetitive justifications Amazon may offer.

## VIII.    ANTITRUST INJURY

84.    Amazon increases the prices of e-books offered by its competitors, restrains consumer choice, and otherwise causes antitrust injury to retail book purchasers in the form of overcharges. Plaintiff and Class members have sustained, and continue to sustain, significant losses from overcharges directly attributable to Amazon's anticompetitive activity. Plaintiff will calculate the full amount of such overcharge damages after discovery and upon proof at trial. Unless Amazon's anticompetitive conduct is enjoined, Plaintiff and Class members will continue

---

[128] *Id.*

[129] *Id.*

to incur overcharges in their direct purchases of the Big Five's e-books from Amazon's competitors.

85.     Plaintiff and Class members are direct purchasers who purchase the Big Five's e-books through retail platforms that compete with Amazon, at prices inflated by Amazon and its co-conspirators' agreements detailed herein.

86.     Because of the agency model, Plaintiff and Class members overpay whether they buy the Big Five's e-books directly from the Big Five on their own websites, or through retail e-book platforms that compete with Amazon. As required by the MFNs and similar clauses described herein, the Big Five sell at retail prices that are equal to or higher than the prices for which they sell their e-books on Amazon. It is in the Big Five co-conspirators' independent economic self-interests to expand their market shares of retail sales and diversify their distribution. It would serve their independent interests to allow Amazon's competitors to develop alternative business models that benefit both consumers and the Big Five. Offering Amazon's competitors special edition or enhanced e-books would attract new customers, increase sales, reduce the Big Five's dependency on Amazon, and limit Amazon's market power. But Amazon and the Big Five do not consider those options, so as to preserve the supracompetitive prices of the Big Five's e-books. Plaintiff and Class members who purchase directly from the Big Five through Amazon's competitors are harmed because they pay prices fixed by Amazon and the Big Five, without the benefit of discounts, promotions, and potentially lower-cost alternative business models that would exist in a competitive market.

87.     Because Amazon continues to enforce its anticompetitive MFNs and similar restrictive provisions, Plaintiff and Class members are will continue to incur overcharges for the

Big Five's e-books. Both the actual harm and the threat of future harm are cognizable antitrust

injuries directly attributable to Amazon's violations of antitrust laws as alleged herein.

## IX.    CLASS ACTION ALLEGATIONS

88.    Plaintiff brings this action on behalf of himself and, under Rules 23(a) and (b) of

the Federal Rules of Civil Procedure, on behalf of:

> All persons who, on or after January 18, 2017, purchased in the United States one
> or more e-books sold by the Big Five Publishers through any online retail
> platform in the United States other than Amazon.

89.    Excluded from the Class are Amazon; its officers, directors, management,

employees, subsidiaries, affiliates, and coconspirators. Also excluded are the judge presiding

over this action; his/her law clerks and spouse; any persons within three degrees of relationship

to those living in his/her household; and the spouses of all such persons.

90.    Members of the Class are so numerous and geographically dispersed that joinder

is impracticable.

91.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff

and members of the Class were damaged by the same wrongful conduct of Defendants.

92.    Plaintiff will fairly and adequately protect and represent the interests of members

of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of members of

the Class.

93.    Plaintiff is represented by counsel with experience in the prosecution and

leadership of class action antitrust and other complex litigation, including class actions involving

conspiracy and monopolization claims.

94.    Questions of law and fact common to the members of the Class predominate over

questions that may affect only individual Class members, thereby making damages with respect

to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

    a.   Whether Amazon and its co-conspirators unlawfully conspired to unreasonably restrain trade in violation of federal antitrust laws;

    b.   Whether Amazon has unlawfully monopolized the domestic retail e-book market, including by way of the conduct described herein;

    c.   Whether competition in the domestic retail e-book market has been restrained and harmed by Amazon's monopolization of the market;

    d.   injury suffered by Plaintiff and members of the Class;

    e.   damages suffered by Plaintiff and members of the Class;

    f.   whether Amazon has acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole; and

    g.   the nature and scope of injunctive relief necessary to restore a competitive market.

95.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

96.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be

pursued individually, substantially outweigh potential difficulties in management of this class action.

97.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

98.     Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of the Class.

99.     By way of its conduct described in this complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

## X.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the Sherman Act § 1)

100.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

101.    Plaintiff brings this claim on his own behalf and on behalf of the proposed Class described above. Plaintiff seeks damages and injunctive relief.

102.    Amazon, by and through its officers, directors, employees, or other representatives, entered into and engaged in unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Amazon and its co-conspirators agreed to restrict competition in the price or availability of trade e-books, by agreeing to various anticompetitive MFNs and anticompetitive provisions that functioned the same as MFNs, thereby fixing and raising the prices of trade e-books.

103.    Amazon and its co-conspirators' combinations and conspiracy injured Plaintiff and the members of the Class by raising the prices of trade e-books and depriving them of free and fair competition in the retail market for trade e-books.

## SECOND CLAIM FOR RELIEF
### (Violation of the Sherman Act § 2)

104.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

105.    Plaintiff brings this claim on his own behalf and on behalf of the proposed Class described above. Plaintiff seeks damages and injunctive relief.

106.    The relevant product market is the retail market for trade e-books.

107.    The relevant geographic market for the retail sale of trade e-books is the United States.

108.    Amazon has had and continues to have at least 75% market share in the retail market for trade e-books.

109.    Amazon has had and continues to have monopoly power in the retail market for trade e-books.

110.    Amazon has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

111.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Amazon has substantially foreclosed competition in the retail market for trade e-books in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

112.    Amazon entered into a combination or conspiracy with its co-conspirators to maintain its monopoly power in the retail market for trade e-books. Amazon created and

maintained this conspiracy through a series of agreements with each of the co-conspirators. In these agreements, Amazon and its co-conspirators agreed, among other things, that Amazon would act as its co-conspirator's agent in the retail sale of trade e-books to Plaintiff and members of the Class.

113.    These agreements foreclosed competition in a substantial portion of the retail market for trade e-books and unlawfully maintained Amazon's monopoly, resulting in the payment of supracompetitive prices for trade e-books by Plaintiff and members of the Class.

114.    Amazon's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

115.    Amazon's monopolization conspiracy has injured and will continue to injure competition in this market.

116.    Amazon has acted with the specific intent of monopolizing the retail market for trade e-books in the United States.

117.    Amazon's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

118.    The conspiracy raised the retail prices for trade e-books above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

119.    Plaintiff and members of the Class have been injured in their business or property by reason of Amazon's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

120.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Amazon's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

121.    Plaintiff and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf the proposed Class of similarly situated persons, respectfully requests the following:

a.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class counsel for the Class;

b.    The conduct alleged herein be declared, adjudged, and/or decreed to be unlawful under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

c.    Plaintiff and the Class recover their overcharge damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law; and

d.    For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury on all issues so triable.

Dated: January 18, 2021        Respectfully submitted,

*/s/*       *Linda P. Nussbaum*
Linda P. Nussbaum
Bart D. Cohen
Louis Kessler
Marc Foto
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
lkessler@nussbaumpc.com
mfoto@nussbaumpc.com

Michael E. Criden
Kevin B. Love
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
(305) 357-9000
mcriden@cridenlove.com
klove@cridenlove.com
lgrossman@cridenlove.com

*Counsel for Plaintiff and the Proposed Class*